**15th JUDICIAL DISTRICT COURT FOR THE PARISH OF LAFAYETTE**

**STATE OF LOUISIANA**

**NO. C-20213591** **DIVISION "E"**

**DEANNA SHOLAS AND TRELAN LANGINAIS**

**VERSUS**

**GREAT DIVIDE INSURANCE COMPANY, ACADIANA WASTE SERVICES, LLC AND DONALD DUGAS**

**FILED:________________**

________________________
**DEPUTY CLERK OF COURT**

**MEMORANDUM IN SUPPORT OF DEFENDANTS' *DAUBERT* MOTION TO STRIKE OR LIMIT TESTIMONY AND REPORTS OF PLAINTIFF'S LIFE CARE PLANNER AND ECONOMIST**

**MAY IT PLEASE THE COURT:**

Defendants, Donald Dugas, Acadiana Waste Services, LLC, and Great Divide Insurance Company (collectively "Defendants"), respectfully submit this Memorandum in Support of their *Daubert* Motion to Strike or Limit Testimony and Reports of Plaintiff's Life Care Planner and Economist. As set forth in the accompanying Memorandum in Support, Defendants seek an Order striking the opinions and unsupported life care treatment plans of vocational counselor and life care planner, Elizabeth Peralta, and excluding her as an expert witness, or in the alternative, to limit the scope of her testimony at trial of this matter. Defendants also seek to exclude or limit the opinions of Plaintiff's economist, G. Randolph Rice, to the extent his opinions are not supported by reliable methodology or are otherwise built upon the unreliable opinions and calculations to be offered by Ms. Peralta. Defendants respectfully submit that the requested exclusion and/or limitation is warranted for the reasons that follow.

## I. FACTS

Deanna Sholas and Trelan Langinais,[1] filed suit against Defendants, on January 4, 2021, asserting claims for bodily injury and other damages allegedly sustained from a motor vehicle accident on July 15, 2020.[2] Elizabeth Peralta was retained by Plaintiff's counsel for the purpose of a vocational assessment and developing a Life Care Plan for Plaintiff, Deanna Sholas, in this matter. Ms. Peralta prepared a report dated October 7, 2022 consisting of her vocational analysis

[1] Mr. Langinais' claims have been voluntarily dismissed and he is no longer a party.
[2] See Plaintiffs' Petition for Damages.

Exhibit "H"

and life care plan for Ms. Sholas.[3] According to Plaintiffs' Expert Witness List, Ms. Peralta was designated as an expert in vocational and life care planning.[4]

Per her report, Ms. Peralta's opinions were based on her interview with Ms. Sholas, a review of records provided by her attorney's office, consultation with treating physicians, and other unspecified research.[5] Ms. Peralta documented her review of the following records:

**RECORDS RECEIVED AND REVIEWED:**

1. Medical records from Advanced Imaging of Lafayette;
2. Medical and billing records from Ambassador Emergency Group;
3. Medical and billing records form Anesthesia Associates of Louisiana, APMC;
4. Medical records from Anesthesia and Pain Consultants, LLC;
5. Medical records from Neurologic Specialty Consulting Services, LLC (David Weir, MD);
6. Medical records from Lafayette Bone & Joint Clinic (Louis Blanda, MD);
7. Medical records from Lafayette Surgical Specialty Hospital;
8. Medical records from Franklin Practice, LLC (Robert Franklin, MD);
9. Medical records from Lafayette General Orthopedic Hospital;
10. Medical and billing records from Southern Spine Institute.[6]

Notably, no records relating to Ms. Sholas' earnings history, earning capacity, employment, education, qualifications, credentials, or licensure were identified. Instead, Ms. Peralta relied exclusively on Ms. Sholas' self-reported history for her vocational assessment:

> **Education and Training:**
> Ms. Sholas graduated from Pickering High School in 2013 and was the valedictorian of her graduating class. She attended the University of Lafayette and obtained an associate degree in general studies. Ms. Scholas then attended South Louisiana Community College to obtain her bachelor's degree in nursing; however, she reported that she took time off from school following the birth of her first child. She noted that prior to leaving South Louisiana Community College, her goal was to become a registered nurse. Ms. Sholas then attended Blue Cliff College and obtained her esthetician license in 2018.[7]

From this history, Ms. Peralta calculated plaintiff's lost wages from her "pre-injury career goal of becoming a ***registered nurse***."[8] Ms. Peralta looked to the Bureau of Labor Statistics and concluded, "[c]onsidering Ms. Sholas' vocational profile, she would have likely been capable of

---

[3] Peralta report and Life Care Plan, dated October 7, 2022, is attached herein as Exhibit "A."
[4] *See* Plaintiff's Expert Witness List attached herein as Exhibit B.
[5] *See* Exhibit "A," at p. 1
[6] *See* Exhibit "A," at pp. 1-2
[7] *See* Exhibit "A," at p. 3
[8] *See* Exhibit "A," at p. 10 [emphasis supplied]

achieving the ***90th percentile for earnings*** in this occupation; therefore, ***$79,360.00 per year is the basis for Ms. Sholas' pre-injury earning capacity as a registered nurse.***"[9] All calculations for Ms. Sholas' lost wages were taken from this foundational metric. Ms. Peralta provided alternate occupations ranging from $23,270.00 to $37,177.00 per annum based on her assessment of Ms. Sholas' post-injury earning capacity.

Plaintiff's economist, Dr. Rice, relied exclusively on Ms. Peralta's estimates as the source material for the calculations contained in his October 17, 2022 report.[10] He estimated the present value of Ms. Sholas' future earning capacity as a *registered nurse* at $1,821,779.00.[11] Dr. Rice then used Ms. Peralta's alternate occupations averaging $30,222.50 per annum (mid-point of post-injury earning capacity) to calculate a total loss of $1,013,493.00 (including $59,083 in estimated past lost wages).[12]

Ms. Peralta, and by extension Dr. Rice, obtained the entirety of Ms. Sholas' "vocational profile," through her self-reporting. On September 6, 2023, Ms. Sholas clarified certain misapprehensions contained in Ms. Peralta's report. Namely, that although she began to study nursing at UL, she abandoned that in favor of pursuing a General Studies major at community college.[13] This information was available to Ms. Peralta for seven months before she issued her April 4, 2024 Updated Life Care Plan.[14] Still, not one change or addendum was made to her vocational assessment or its ultimate underpinning that Plaintiff's future lost wages was calculated starting from the wages of a registered nurse earning in the top 90th percentile of her profession.[15] Ms. Peralta's updated report instead reiterated that "Ms. Sholas remains unable to return to work as an *esthetician* and as a *registered nurse*."[16]

At the time of her April 4, 2023 addendum report, Ms. Peralta only reviewed additional medical records, medical bills, and prescriptions that served to inflate the future medicals and prescription costs of her life care plan. These additional records were devoid not only of Plaintiff's deposition and answers to interrogatories (both confirming a more accurate educational and work history), but also continued to omit any evidence of employment, education, certificates, licensures, or any other objective record of earnings or earning capacity.

---

[9] *See* Exhibit "A," at p. 10 [emphasis supplied]
[10] *See*, October 27, 2023 report of Dr. Rice at p. 1, attached as Exhibit "C."
[11] *Id.*, at p. 2.
[12] *Id.*
[13] *See*, September 6, 2023 deposition excerpt at p. 14, lines 13-23 attached as Exhibit "D."
[14] *See*, April 4, 2024 letter and Updated Life Care Plan prepared by Ms. Peralta, attached as Exhibit "E."
[15] *See*, Ex. "A," *Id.*, at p. 10.
[16] *See*, Ex. "C," at p. 5.

Ms. Peralta's assessment of lost wages remained unchanged, but her updated life care plan expanded the estimate for future costs from the initial range of $246,789.85 to $258,335.57 up to a range of $2,075,170.30 to $2,190,027.46. This represented an approximate ***4X increase in her estimated future costs.*** As detailed below, this was accomplished primarily by extending prescriptions and treatment for headaches, which had been previously limited to a three-year period.[17] Ms. Peralta's updated life care plan extended those costs throughout Plaintiff's entire life expectancy.[18] The following day, on April 5, 2023, Dr. Rice issued a supplemental report calculating the present value of Ms. Peralta's inflated figures to further increase those figures to a range of $2,130,635.00 to $2,242,472.00.

As more fully explained herein, Ms. Peralta's reports and opinions must be excluded and/or limited because they are not based on sufficient facts or data and are so speculative that they provide no assistance to the trier of fact. They represent exactly the testimony the Louisiana Rules of Evidence are designed to limit. Further, Dr. Rice's calculations and reports must also be excluded as they only add indefensible present value calculations to Ms. Peralta's unfounded and massively inflated estimates.

## II. LAW AND ARGUMENT

### A. Standard for Admissibility of Expert Testimony

Louisiana Rule of Evidence Rule 702 governs the admissibility of expert testimony. Article 702 provides in part:

> A. A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (1) The expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (2) The testimony is based on sufficient facts or data;
>
> (3) The testimony is the product of reliable principles and methods; and
>
> (4) The expert has reliably applied the principles and methods to the facts of the case.

[17] *See*, Ex. "A," at p. 12 (Limiting Botox Injections to 3 years) and p. 16 (Limiting "Ajovy" & Nurtec prescriptions to 3 years)

[18] *See*, Ex. "E," at p. 6 (Expanding Botox Injections for entire life expectancy) and p. (Expanding "Aimovig" & Nurtec prescriptions for entire life expectancy)

The United States Supreme Court imposed a "gatekeeping" obligation upon courts to ensure that expert testimony is both reliable and relevant.[19] *See Gunn v. Robertson*, 801 So.2d 555, 565 (La.App. 5th Cir.2001) (noting that future loss of earning are inherently speculative damages, and thus to obtain such an award a plaintiff must present medical evidence that indicates with reasonable certainty that a residual disability causally related to the accident exists), *cert. denied*, 811 So.2d 942 (La.2002); *Dennis v. Finish Line, Inc.*, 787 So.2d 12, 41 (La.App. 2nd Cir.2000) (concluding that the trial court's assignment of any value to loss of future earning capacity was manifestly erroneous, considering that the economist's projection was based upon an assumption that the plaintiff had lost her ability to earn a college degree, an assumption which was not supported by the evidence in the case); *Pontiff v. Pecot & Associates Rehabilitation & Physical Therapy Services, Inc.*, 780 So.2d 478, 487 (La.App. 3rd Cir.2001) (medical testimony that a plaintiff either cannot work, or has a reduced capacity to work is essential to establishing loss of future income); *Budd v. State Farm Mutual Automobile Insurance Company*, 650 So.2d 429, 433 (La.App. 3rd Cir.1995) (purely conjectural or uncertain future loss of earnings are not recoverable and no award loss of earning capacity was proper where the plaintiff earned more than his pre-accident wage, continued to work at his same job, and there was no expert testimony regarding the economic impact of plaintiff's injuries); *Housley v. Cerise*, 597 So.2d 71, 73–74 (La.App. 4th Cir.) (holding that "a plaintiff must present evidence that a loss of earning capacity has, in fact, been sustained," and vacating award of earning capacity), *cert. denied*, 600 So.2d 646 (La.1992).

In the present matter, Ms. Peralta's proposed future treatments are not within the field of recognized and certified functions of a life care planner and do not meet the rigorous standards of article 702. Further, there is a lack of documentation to support her conclusions which indicates that faulty or incomplete facts and data were relied upon in the formulation of her opinions regarding both Ms. Sholas' vocational assessment future care. Accordingly, Ms. Peralta should be excluded as an expert in this matter and her life care plan stricken, or alternatively, her opinions and life care plan limited. As Ms. Peralta's opinions and misplaced assumptions also serve as the foundation for Dr. Rice's present value calculations, those opinions should be similarly excluded or limited.

[19] *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993).

**B. Ms. Peralta's Opinions Must be Excluded as they Lack a Reliable Foundation.**

**(1) Vocational Assessment / Lost Wages Opinions:**

Ms. Peralta's opinions on Plaintiff's vocational abilities and lost future wages have no basis in objective fact and are contradicted by Plaintiff's own sworn testimony. Key among Ms. Peralta's misapprehensions is that Ms. Sholas "attended the University of Lafayette and obtained an associate degree in general studies, then attended South Louisiana Community College to obtain her bachelor's degree in nursing."[20] Despite the fact that the University of Louisiana Lafayette does not offer associate degree programs[21] and South Louisiana Community College does not offer bachelor degree programs,[22] Ms. Sholas did not receive any degree in nursing at any time.[23] Indeed, she took no steps toward obtaining a nursing degree beyond her preliminary selection of a major.[24] Objective evidence including educational transcripts, employment records, and W-2 Wage and Tax Statements further confirm that Ms. Sholas did not possess any type of pre-accident capacity to obtain or maintain licensure or employment as a nurse.[25]

Ms. Peralta's report sets forth wildly inflated estimates of plaintiff's potential economic damage claims, based on information and assumptions that are unsupported by, and contrary to, the evidence in this case. Because Dr. Rice's report is based on Ms. Peralta's grossly inflated wage bases that are contrary to the facts of this case, it too is unreliable and irrelevant. To allow either Ms. Peralta or Dr. Rice to testify to such inflated, unsupported economic damage figures at trial would be unfair, improper, and highly prejudicial.

In particular, plaintiff's experts use of the $79,360.00 annual earnings (based on the 90th percentile of registered nurse salaries) as a base metric for calculating lost wages. Considered in the context of Ms. Sholas not taking a single meaningful step toward a nursing degree beyond initial college registration, this estimate is grossly inflated and contrary to the evidence. After she initially enrolling in nursing, Ms. Sholas either failed or dropped all classes arguably related to that major, changing her major to General Studies, then to Public Relations, and then to Mass Communications.[26] Ms. Sholas never pursued nursing further. Ms. Sholas instead enrolled in

---

[20] *See* Exhibit "A," at p. 3

[21] https://louisiana.edu/majors-minors, last visited April 23, 2024.

[22] https://www.solacc.edu/academics/programs-offered/index, last visited April 23, 2024.

[23] *See*, February 29, 2024 report of Defendants' Vocational / Life Care Expert, Ian J. Hegwood, CRC, LRC, CLCP, at p. 4, attached as Exhibit "F."

[24] *Id.*

[25] *See*, April 9, 2024 report addendum of Mr. Hegwood at p. 3, attached as Exhibit "G."

[26] *See*, Exhibit "F," at p. 2.

community college, which actually had a nursing program, where she instead pursued an associate degree in General Studies before pursuing an esthetician license.

As an esthetician, Ms. Sholas worked only sporadically – never earning more than $8,396.14 in any calendar year.[27] The assumed $79,360.00 registered nurse wage base of Ms. Peralta and, by extension, Dr. Rice, is so grossly inflated, unrealistic, and unreasonable that it is "abusive of the known facts."[28] Courts must disallow economic testimony based on inflated, unsupported wage bases like those used here by Ms. Peralta and Dr. Rice.

In *Gumbs v. International Harvester*, 718 F.2d 88 (3d Cir. 1983), the court noted several problems with the plaintiff's economist's opinions, including the fact that he had "based his projections on an annual income of $14,000, more than twice the plaintiff's average annual income for the four years preceding the accident..."[29] The court held that the plaintiff's economist should not have been allowed to testify:

> And Dr. Jones-Hendrickson doubled plaintiff's proven annual income to estimate future earnings loss, but no evidence was presented to demonstrate that plaintiff was likely to experience such a dramatic increase in income. On remand, plaintiff's expert's testimony must be accompanied by a sufficient factual foundation before it can be submitted to the jury.[30]

Similarly, in *Boucher v. U.S. Suzuki Motor Corp.*, 73 F.3d 18 (2d Cir. 1996), the court held that the trial court had abused its discretion in permitting the plaintiff's expert economist to testify "based on the unrealistic and speculative assumption that Boucher would have been employed on a permanent, full-time basis, year in and year out, had he not been injured."[31] The court explained:

> In the present case, Dr. Reagles estimated Boucher's lost earnings based on the assumptions (among others) that Boucher would work 40 hours per week, 52 weeks per year, with fringe benefits and regular pay increases for the rest of his career. Prior to the accident, however, Boucher's sporadic employment had yielded fluctuating low levels of income, with long spells of no income whatsoever. When he was employed, he received few fringe benefits, if any.[32]

The court went on to note that the evidence did not

> support an assumption that [plaintiff's] employment prospects had undergone any fundamental change, or that his employment with Herba would no longer be seasonal (as it was in the past), and it certainly cannot support an inference that, at the time he was injured, Boucher was on the verge of a twenty-four year career of clock-punching.[33]

---

[27] *See*, Exhibit "F," at p. 5.
[28] *In Re Air Crash Disaster at New Orleans, Louisiana*, 795 F.2d 1230, 1233 (5th Cir. 1986)
[29] 718 F.2d at 98.
[30] *Id.*
[31] 73 F.3d at 22.
[32] *Id.*
[33] *Id.*

See also, *Williams v. Rene*, 72 F.3d 1096, 1102 (3d Cir. 1996) (trial court should exclude economic projections based on unsupported and speculative assumptions concerning pre-accident earning capacity); *Hernandez v. M/V RAJAAN*, 841 F.2d 582, 587-88 (5th Cir. 1988) (calculation of economic losses based on $23,000 annual wage base was clearly erroneous when plaintiff had earned between $2,600 and $8,600 per year in four years preceding his accident).

Ms. Peralta's and Dr. Rice's use of the 90th percentile of annual wage bases for registered nurses in this case, at the request of Plaintiff's attorney, is precisely what the courts in *Gumbs, Williams, Hernandez* and *Boucher* rejected: a transparent attempt to portray an unskilled, modest income underachiever as a fully and consistently employed, highly paid, skilled worker for the purpose of placing shameful economic damage estimates into the record at trial. Here, Plaintiff's experts' inflated economic damage estimates using wage bases multiple times larger than the her actual annual earnings must be excluded. Allowing either Ms. Peralta or Dr. Rice to testify based on such unrealistic, unsupported, and insupportable annual earnings bases is a waste of judicial resources.

**(2) Future Medical / Prescriptions Opinions:**

Ms. Peralta's updated life care plan increased Ms. Sholas' future medical and prescription drug costs by a factor of four (4). This seismic change is due almost exclusively to a reported increase in her subjective complaints of headaches. Ms. Peralta simply took the three most expensive recurring items that had previously been limited to 3 years[34] and expanded them out over the course of Plaintiff's entire life expectancy.[35]

Ms. Peralta's inflated life care plan compounded by Dr. Rice's present value *premium* increased future medical and prescription costs up to $2,242,472.00 (from less than a quarter of that just a few months prior). These constitute new opinions that demand a rebuttal.[36] Even so, these latest opinions do not appear to be final. Ms. Peralta's last report notes she is still "awaiting consultation with Dr. Henderson to confirm his opinions regarding Ms. Sholas' future medical care needs due to her injuries sustained on 07/15/2020. Should I be able to consult with him, I will amend my report as necessary. This is a dynamic document and amendments will be made at any time based on Ms. Sholas' changing needs or additional information."[37] This "additional

[34] *See*, Ex. "A," at p. 12 (Botox Injections) and p. 16 (Ajovy & Nurtec)
[35] *See*, Ex. "E," at p. 6 (Botox Injections) and p. (Aimovig & Nurtec)
[36] Defendants have identified rebuttal expert Dr. Chad Domangue to conduct an IME on plaintiff regarding, *inter alia*, the causation of her headache claims and necessity of treatment.
[37] *See*, Ex. "E," at p. 6

information" apparently only cuts one way insofar as she and Dr. Rice refuse to consider any evidence of Plaintiff's actual earning capacity.

Regardless, Ms. Peralta is not one of Ms. Sholas' treating physicians, is not a medical doctor, and has not diagnosed or treated Ms. Sholas for any medical condition. She has not and cannot form any opinions regarding Plaintiff's diagnosis, treatment, or the necessity of her future medical treatment and prescription drugs. When, as here, an expert's opinions are not based on the Plaintiff's clinical treatment history or medical records, they lack the foundation and reliability necessary to support expert testimony.[38] Further, when an expert's report is unclear about which facts or data she is using to support her opinions or conclusions, it lacks the specificity required to ensure reliability.[39] Simply, the expert's opinions must be supported by the evidence. Ms. Peralta's inflated life care plan is not.

In *Vaughn v. Hobby Lobby Stores, Inc.*,[40] the plaintiff's life care planner recommended significant medical treatment (and expense) without pointing to the specific requisite support from a treating physician.[41] The Court ruled the life care planner's testimony was not predicated upon the testimony of treating physicians as to the reasonable need for such care and the cost of such care.[42] Without such specific medical testimony, the life care planner's own opinions of future medical costs related thereto is not sufficient.[43] The *Vaughn* court ruled that plaintiff failed to carry her burden of establishing the reliability her life care planner's reports and opinions.[44]

In this case, Ms. Peralta failed to cite to any written report, medical record, or deposition testimony supporting that Plaintiff will more probably than not need the additional headache treatment and prescriptions for the rest of her life. More fundamentally, there is no written report, medical record, or deposition testimony from any physician establishing the causal relationship of Plaintiff's headaches to the subject motor vehicle accident.[45] Ms. Peralta's supplemental report simply expands the most costly prescription drugs and treatment from a three-year period to the

---

[38] *Rea v. Wisconsin Coach Lines, Inc.*, 2014 WL 4981803 (E.D. La. 10/03/14), 95 Fed. R. Evid. Serv. 788.
[39] *Id.*
[40] No. 6:19-CV-00293, 2021 WL 2131867 (W.D. La. May 25, 2021).
[41] *Id.* at *6.
[42] *Id.*
[43] *Id.*
[44] *Id.* at *7; see also, *Snider v. N.H. Ins. Co.*, No. CV 14-2132, 2016 WL 3193473 (without written reports, medical records or deposition testimony supporting her opinions, life care planner's report and opinions should be excluded) and *Lawrence v.Great Lakes Dredge & Dock Co., L.L.C. of Louisiana*, No. CV 17-9775, 2019 WL 9045085, at *1 (E.D. La. Apr. 24, 2019). (Court expressing concern over practice of life care planner getting her pre-determined conclusions "rubberstamped" by doctors after the fact).
[45] *See*, Ex. "D," at p. 6 ("[A]waiting consultation with Dr. Henderson to confirm his opinions regarding Ms. Sholas' future medical care needs due to her injuries sustained on 07/15/2020. Should I be able to consult with him, I will amend my report as necessary.")

rest of Ms. Sholas' life based on her own interpretation of Ms. Sholas' purported increasing subjective complaints of headaches.

It is essentially Ms. Peralta herself that is recommending these prescriptions and injections secondary to subjective headache complaints be conducted throughout the remainder of Plaintiff's life. In so attempting to inflate Plaintiff's damages, Ms. Peralta disregards the potential efficacy of all other purportedly necessary medical treatment and procedures designed to correct, among other things, Ms. Sholas' purported neck pain and subjective complaints of headaches. Ms. Peralta's opinions and recommendations are highly speculative, without factual foundation, and contradicted by her own life care plan. Her testimony regarding these inflated costs must be excluded from the record, or alternatively, limited to that supported by specific medical records or physician testimony.[46] Dr. Rice's derivative opinions calculating present value of Ms. Peralta's updated life care plan must be excluded for precisely those same reasons.

**C. The Methodology Underpinning Plaintiff's Expert Opinions is Flawed.**

Ms. Peralta's calculation of Life Expectancy was derived from a specious methodology and is flat out wrong. She calculates Life Expectancy from the time of her respective reports (rather than the time of the accident) and fails to utilize the specific table applicable to Ms. Sholas.[47] As such, Ms. Peralta's calculation erroneously adds almost 3 years to Ms. Sholas life expectancy.[48] This serves to further inflate her updated life care plan. Dr. Rice's present value calculations build off Ms. Peralta's incorrect Life Expectancy assumptions and are therefore equally flawed.

Dr. Rice's opinion is unreliable in another respect. Instead of utilizing a traditional present value discount rate, Dr. Rice employs a net negative discount rate. That is to say he does not provide any present value *discount* at all. Rather, his reports manufactures a present value *premium*. Dr. Rice fails to identify the source or explain in any detail how he arrived at his formulation of a -1.0 % present value calculation.[49] Whatever methodology he may have applied, it appears not to exist outside of Dr. Rice's own intellectual province.[50]

---

[46] Further in the alternative, it is premature at best and further consultation with Dr. Henderson (per Ms. Peralta's own report) and Dr. Chad Domangue, Defendants' choice of IME is warranted.

[47] *See*. p. 5 of the March 12, 2024 *Analysis of Present Value of Future Medical Care Costs of Deanna Sholas* prepared by expert economists Edward J. Comeaux, III, CPA/ABV and Leah B. Schaff, CPA/CFF, attached as Exhibit "H."

[48] *See*, Ex. "H," at p. 5.

[49] *Id.* ("The Rice Report does not provide the details of how those rates were determined or the sources of that information to enable the verification and re-computation of those rates.")

[50] *Id.* ("a net negative discount rate is not appropriate.")

Both of Ms. Peralta's reports state "This life care plan was generated in accordance with the IARP and ICHCC standards. It represents requirements as I understand them…"[51] That begs the question: *What are those standards and requirements?* The website for Ms. Peralta's practice group details those standards and requirements as follows:[52]

STOKES

## What are the Standards of Practice for Life Care Planners?

Standards of Performance relate to the readiness of an individual to work ethically and competently as a life care planner. Issues such as having the proper educational background, maintaining the appropriate licensures, participating in continuing education, and adherence to professional ethics are stressed. These Standards of Performance spell out the minimum professional requirements for life care planners, yet do not provide specific information regarding the technical practice of producing a plan.

In contrast, The Standards of Practice give clear guidance regarding the generally accepted methods for evaluating an individual and disseminating professional life care planning opinions in written format. They include:

Remaining within the professional scope of practice

LCP must have skill and knowledge in understanding health care needs in the plan

**Performs a comprehensive assessment (multiple sources, systematic manner)**

LCP uses a consistent, valid, and reliable approach to research, data collection, etc.

Here, Ms. Peralta failed to meet the minimum professional requirements for life care planners in that she did not perform any kind of comprehensive assessment from multiple sources in a systematic manner. Her only sources were the self-serving documents Plaintiff's counsel provided her and the self-serving (and incorrect) narrative taken from Plaintiff herself. Ms. Peralta engaged in no independent data collection whatsoever and did not even verify on publicly available databases plaintiff's licensure (or lack thereof).

More specific to vocational rehabilitation assessments, the following standards and requirements were applicable to Ms. Peralta's evaluation of Plaintiff:[53]

[51] *See*, Ex. "A," at p. 18; Ex. "C," at p. [illegible]
[52] https://www.stokes-associates.com/blog/2019/1/2/what-are-the-standards-of-practice-for-life-care-plannersvocational assessment
[53] https://www.stokes-associates.com/vocational-rehabilitation-assessments

# Vocational Rehabilitation — Stokes & Associates

Our rehabilitation experts are licensed and certified professionals, who have worked extensively in both clinical and forensic capacities. We provide **vocational rehabilitation assessments** of injured individuals in order to determine an individual's **rehabilitation potential** and **wage-earning capacity** to determine any changes in vocational status.

## Employability Assessment

An Employability assessment is an *initial vocational interview* that provides rich information regarding the interviewee's educational attainment, vocational training, work and earnings history, reported physical limitations, vocational interests, transferable skills, knowledge about searching jobs, as well as values and motivation for work.

In addition, a *review of medical documentation* and other records, such as functional capacity evaluations and depositions, provides the contextual information to formulate opinions regarding pre- versus post-injury rehabilitation potential and employability.

...

In addition, *a review of medical documentation* and other records, such as functional capacity evaluations and depositions, provides the contextual information to formulate opinions regarding pre- versus post-injury rehabilitation potential and employability.

***Records tell a story, and in order for us to provide a comprehensive assessment, having documents in our possession prior to rendering our opinions is important. In general, the more information we have early in the process, the better able we are to see the whole story.***

***Determining loss of earning capacity involves careful study of pre- and post-injury abilities, in addition to labor market research, where up-to-date earning data is presented.***

## Lost Wages

Lost wages is the total sum of wages an individual could have earned during a certain period but for an injury. To determine lost wages, we reference tax records, earning statements, and/or standardized research.

## Earning Capacity

Earning capacity is the ability to earn wages in the future, which may be diminished following injury or illness.

In some instances, an individual may have the opportunity to earn the same or more than he or she was prior to the injury. In other instances, an individual may be unable to earn his or her pre-injury wages or may be removed from the labor market entirely. Determining loss of earning capacity involves careful study of pre- and post-injury abilities, in addition to labor market research, where up-to-date earning data is presented.

Records do indeed tell a story. In Ms. Sholas' case, her records tell a decidedly different story from the false narrative she gave to Ms. Peralta about becoming a registered nurse. The importance of having all earning capacity documents in hand, not just that gleaned from an initial interview, is self-evident and was required for this vocational assessment. These documents specifically included Plaintiff's deposition which was not reviewed by Ms. Peralta. The twice-emphasized "careful study" of pre- and post-injury abilities underscores the complete inadequacy of relying on Plaintiff's initial self-serving narrative to the exclusion of all objective data.

An expert witness, at a minimum, should follow the standards and practices promulgated by the organization that issues the certification in her field and her own practice group's published standards. Ms. Peralta fails to do so. Her calculations are based on biased data that is inaccurate and incomplete. Her report not only fails to take into account, but flatly contradicts Plaintiff's own sworn testimony, responses to discovery, employment records, tax records, social security earnings records, educational transcripts, and in publically available licensing databases.[54] Ms. Peralta failed to meet the minimum standards of the IARP and ICHCC as distilled on her own company's website. She has no reliable basis for her opinions.[55]

## III. CONCLUSION

Ms. Peralta's and Dr. Rice's reports and opinions are unreliable, without foundation, and based on specious methodology in violation of Louisiana Code of Evidence articles 702 and 403. Therefore, Defendants pray that this Honorable Court enter an Order excluding Ms. Peralta and Dr. Rice as experts along with their respective reports, or, alternatively, striking their calculations of future lost wages and unsupported life care treatment plans.

---

[54] *See, generally*, Ex. "F" and "G"

[55] *See, Tezeno v. Young*, 2019 WL 6736260 (La.App. 3 Cir. 12/11/19) (finding the lower court erred in awarding future medical expenses based on a life care plan with no factual basis for determining awards other than that she was asked to by plaintiff's counsel).

Respectfully submitted,


*/s/ Allyson C. Byrd*
**ALLYSON C. BYRD** (#35703)
**PAMELA B. GAUTIER** (23999)
**HANNAH C. STIERWALD** (#40958)
McGlinchey Stafford, PLLC
601 Poydras Street, 12th Floor
New Orleans, Louisiana 70130
Telephone: (504) 586-1200
Facsimile: (504) 910-8813
Email: abyrd@mcglinchey.com
pgautier@mcglinchey.com
hstierwald@mcglinchey.com
*Counsel for Defendants, Donald Dugas, Acadiana Waste Services, LLC, and Great Divide Insurance Company*


## CERTIFICATE OF SERVICE

I HERBY CERTIFY that I have served a copy of the above and foregoing on all known counsel of record by email, facsimile and/or by U.S. Mail, properly addressed and postage pre-paid, this 24th day of April, 2024.

*/s/Allyson C. Byrd*
**ALLYSON C. BYRD**